**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

SUSAN MARZULLO,

              Plaintiff,

      v.                                CAUSE NO.: 2:18-CV-476-TLS

NLMK INDIANA, LLC,

              Defendant.

**OPINION AND ORDER**

The Plaintiff, Susan Marzullo, filed three charges with the Equal Employment

Opportunity Commission (EEOC), against her employer, the Defendant NLMK Indiana, LLC—

a June 20, 2016 charge of sex discrimination and two charges filed on June 26, 2017, one

alleging sex discrimination and retaliation and the other alleging disability discrimination. Ex. A,

Dep. Exs. 7–9, ECF No. 29-1, pp. 237–39.[1] On December 19, 2018, the Plaintiff filed her

Complaint [ECF No. 1] in this Court, asserting claims of sex discrimination, hostile work

environment, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,

et seq. (Title VII), and claims of a disability-related inquiry and retaliation under the Americans

with Disabilities Act, 42 U.S.C. § 12101, et seq. (ADA).

This matter is now before the Court on the Plaintiff's Motion for Partial Summary

Judgment [ECF No. 18], the Defendant's Motion for Summary Judgment [ECF No. 28], and the

Defendant's Motion to Strike Inadmissible Evidence Tendered in Support of Plaintiff's Brief in

Opposition to Summary Judgment [ECF No. 42]. For the reasons set forth below, the Court

---

[1] The Defendant's Exhibits are referred to herein as "Ex." followed by a letter. *See* Def.'s App. in Support of Def.'s Mot. for Summ. J., Exs. A–J, ECF Nos. 29-1 – 29-10. The Plaintiff's Exhibits are referred to as "Ex. SJ-" or "Ex. SM-" followed by a number. *See* Pl.'s Mem. in Support of Mot. for Partial Summ. J., Exs. SJ-1 – SJ-10, ECF No. 19-1; Pl.'s Mem. in Opp., Exs. SM-12 – SM-24, ECF No. 37-1 – 37-3.

DENIES the Plaintiff's Motion for Partial Summary Judgment, GRANTS the Defendant's Motion for Summary Judgment, and DENIES the Motion to Strike as moot.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is the moment in litigation where the non-moving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in favor of that party. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). "'[I]rrelevant or unnecessary' factual disputes do not preclude summary judgment." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

These principles apply to cross-motions for summary judgment just as they would to a garden-variety summary judgment motion. *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). "[W]hen cross-motions for summary judgment are filed, [e]ach movant has the burden of establishing the absence of any genuine issue of material fact on its own motion." *Grabach v. Evans*, 196 F. Supp. 2d 746, 747 (N.D. Ind. 2002). The Court must construe all facts in the light most favorable to the party against whom the motion under consideration is made. *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361 (7th Cir. 2017) (citing *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016)). The party that bears the burden of proof on a claim "must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant

on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citations omitted).

## MOTION TO STRIKE

"A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Here, the Defendant asks the Court to strike as inadmissible hearsay two documents offered by the Plaintiff in opposition to the Defendant's Motion for Summary Judgment. Because neither document is material to the instant decision, the Court denies the Motion to Strike as moot.

First, the Defendant argues that the eighteen pages of Plaintiff's handwritten notes, submitted as Plaintiff's Exhibit SM-24, are hearsay. *See* Ex. SM-24 (Dep. Ex. 35), ECF No. 37-3. The Plaintiff's brief only references the notes in a general statement about her deposition testimony: "Some of the hostility in the work environment was captured in [the Plaintiff's] notes, discussed during her deposition." Pl.'s Mem. in Opp. 15, ¶ 24, ECF No. 37 (citing Ex. A (Pl.'s Dep.); Ex. SM-12 219–35 (Pl.'s Dep.); Ex. SM-24)).[2] Yet, the Plaintiff's response brief does not discuss or cite any specific portion of the notes or of the Plaintiff's deposition testimony about the notes. Thus, the handwritten notes are not material to the Court's decision.

Second, the Defendant contends that the email submitted as Plaintiff's Exhibit SM-22 is hearsay because it is being offered to prove an alleged interaction with the Plaintiff's supervisor. *See* Ex. SM-22, ECF No. 37-3. This exhibit is a two-paragraph email dated December 19, 2016, which constitutes a grievance by the Plaintiff to her union regarding two incidents. However, the Plaintiff does not discuss or rely on the email itself, citing the email only in support of this statement: "Marzullo testified to the difficulty she experienced on December 16, 2016 when she

---

[2] Page 233 of the Plaintiff's deposition transcript was not submitted by either party.

asked Beach who would cover for her when she would be on vacation. Beach 'got very strange with her' and told her that he did not need her or any hourly workers." Pl.'s Mem. in Opp. 15, ¶ 20 (citing Ex. SM-12 241–44; Ex. SM-22). Therefore, the email is likewise not material to the Court's decision. The Court denies as moot the Motion to Strike Exhibits SM-24 and SM-22.

## MATERIAL FACTS

### A.   The Plaintiff's Employment as Stevedore at NLMK

*1.   The Defendant's Plant in Portage, Indiana, and the Plaintiff's Role as Stevedore*

The Defendant operates a manufacturing plant (the "Plant") at the Port of Indiana in Portage, Indiana, where the Plaintiff and approximately 300 other union employees work. Ex. H ¶ 3 (Beach Aff.), ECF No. 29-8. Derek Beach is the Defendant's Manager of Logistics and Materials Handling and is the Plaintiff's supervisor. *Id.* ¶ 2.

The Plaintiff has been employed as a stevedore by the Defendant since it acquired the Plant from Beta Steel in 2008; before that, the Plaintiff worked for Beta Steel from 1992 to 2008. Ex. A 13:19–14:2, 15:4–6, ECF No. 29-1; Ex. C ¶ 5 (Gazarkiewicz Aff.), ECF No. 29-3. The Plaintiff is the only full-time stevedore at the Plant and has been the Defendant's only stevedore since 2008. Ex. A 16:23–17:4, 17:21–23. The Plaintiff coordinates and oversees all dock activity and any activity at the port or in the mill involving longshoremen from the International Longshoremen's Association, Local 1969 (the "Local 1969 Dockworkers"). *Id.* 15:22–24, 18:3–17. The Local 1969 Dockworkers are not regular employees of the Defendant. *Id.* 18:18–19:1.

The Plaintiff is a member of the International Longshoremen's Union, Local 2038 ("ILA Local 2038"). Ex. C ¶¶ 3, 4; Ex. A 24:19–24. A collective bargaining agreement between the Defendant and ILA Local 2038 ("CBA") controls the terms and conditions of employment of the ILA Local 2038 employees at the Plant. Ex. A 24:19–24, 170:12–24, 272:4–7; Ex. A, Dep. Ex. 4

(CBA), ECF No. 29-1, pp. 151–235; Ex. A, Dep. Ex. 6 (Pl.'s Acknowledgement), ECF No. 29-1, p. 236; Ex. C ¶ 3.

The Plaintiff has top seniority among the union members working for the Defendant. Ex. E 29:21–23 (White Dep.), ECF No. 29-5; Ex. SM-17, ECF No. 37-2, p. 36. Seniority is used to make various decisions under the CBA, including certain job assignments, layoffs, and recalls. *See, e.g.*, Ex. A, Dep. Ex. 4, Article 7, Article 8, Section 11.9, Section 12.2, ECF No. 29-1, pp. 157, 159, 167, 169.

Under Article 11 of the CBA, jobs are classified and sequenced. *Id.* Article 11, ECF No. 29-1, p. 165. Job sequences "provide upward mobility and a progression to higher wages for [e]mployees." *Id.* In addition to the job sequences, there are "specialty positions," which may be within or outside a job sequence. *Id.* Section 11.6, ECF No. 29-1, p. 166. "Stevedore" is a "specialty position" that "oversees and coordinates maritime work at the docks." *Id.* "Specialty positions are not awarded by Seniority and are exempt from the requirements for: a) layoff/recall procedures as defined in Article 8; and b) job posting and bidding procedures as required by Article 12." *Id.* Employees may be placed in temporary assignments but are paid their regular hourly rate when temporarily assigned to a lower-pay position. *Id.* Section 12.4, Section 15.4, ECF No. 29-1, pp. 170, 175; *see also* Ex. F 45:5–46:12 (Beach Dep.), ECF No. 29-4.

As for training opportunities, the CBA provides: "Within each Job Sequence, the Employer will provide all Employees (in accordance with their Sequence Seniority), an equal opportunity to develop their skills, knowledge and experience in order to earn higher wages through a continuous training program throughout all Job Sequences." Ex. A, Dep. Ex. 4, Section 11.9, ECF No. 129-1, p. 167. The requirements for promotion to a higher job classification apply "both within a Job Sequence or to a different Job Sequence." *Id.*

2.     *The Plaintiff's Requests for Training and Advancement and her Compensation as Stevedore*

The Plaintiff sought training opportunities to enable her to obtain another job in the event the stevedore position is no longer available to her. Ex. A 52:6–53:2. An employee can train outside of the employee's sequence, and a bid is not required to do so. Ex. A 52:10–14; Ex. SM-14 59:23–25 (White Dep.), ECF No. 37-2.

The Plaintiff would like to earn the hourly pay of a "temporary supervisor," which is also a "specialty position" in the CBA. Ex. A 269:4–11; Ex. A, Dep. Ex. 4, Section 11.6, ECF No. 29-1, p. 166. The temporary supervisor position is defined as "[a] position for the continuous development of hourly personnel for possible advancement to salaried supervisory positions," and "[t]he assignment should not exceed six (6) months." Ex. A, Dep. Ex. 4, Section 11.6, ECF No. 29-1, p. 166. According to the CBA, the temporary supervisor position earns a higher hourly wage rate than that earned by the Plaintiff as stevedore. *Compare id.* Article 13, ECF No. 29-1, p. 173, *with* Ex. E, Dep. Ex. 3.[3]

The Plaintiff has asked the Defendant for this temporary supervisor position numerous times and has been denied. Ex. A 54:21–55:2. She testified that "[t]emporary supervisor is, on a regular basis, given to men. And it's an increase of several dollars above their . . . hourly wage rate. That's an opportunity I was looking for. I work in a supervisory capacity." *Id.* 54:21–25. To support her conclusion that her request for the temporary supervisor pay was declined because of her gender, the Plaintiff offered, "The fact that everyone that's on the list right now are men. And, I - - being female, but I am the number one person. Objectively I should be considered." *Id.* 55:3–9. She testified that some men have had the position "for years." *Id.* 56:1–4. She described

_____

[3] The Plaintiff's personal rate of pay as stevedore is higher than provided for in the CBA per a letter agreement between ILA Local 2038 and the Defendant. Ex. A 15:7–19, 27:11–15; Ex. E 17:13–18:20; Ex. E, Dep. Ex. 3, ECF No. 29-5.

the temporary supervisor position as "just a title that's - - a wage rate title. It's what they use because it's written in the contract." *Id.* 56:5–8. Since January 1, 2016, only male ILA Local 2038 members have received "planner" or "temporary supervisor" pay. Ex. SM-19, Def.'s Interrog. Answer 16, NLMK 00375, ECF No. 37-3. Since January 1, 2015, only males have been promoted/transferred from a bargaining unit position to a managerial position. *Id.* Def's Interrog. Answer 5, NLMK 00374, 00374-A.

**B.      2015 Discussion about Making the Stevedore Position Salaried**

*1.      The CBA Negotiations*

At the outset of negotiations between the Defendant and ILA Local 2038 for the CBA that was ratified on September 28, 2015, there was a conversation about various positions under the CBA, one of which was the stevedore position. Ex. D 27:21–28:3 (Gazarkiewicz Dep.), ECF No. 29-4; *see* Ex. A, Dep. Ex. 4. The conversation was initiated by H.B. Kincaid, Vice President of Operations at the Plant, who raised questions with the union committee such as whether the stevedore position should be removed from the CBA and be salaried because of its responsibility or whether it should be a position that fits in a sequence rather than a specialty position. Ex. D 27:21–29:13. Gazarkiewicz, who was present for the conversation, testified that he and Kincaid did not discuss the idea in advance. *Id.* 28:10–12. The discussion did not specifically mention the Plaintiff, although she is the only stevedore; and there was no discussion about removing the Plaintiff from the stevedore position. *Id.* 42:3–14. The topic was tabled and not discussed again after that initial conversation; "no move was ever made to move that position." *Id.* 28:3–7. Beach testified that no member of management asked his opinion about the status of the stevedore position. Ex. F 20:5–20:9.

2.      *The Plaintiff's Belief that Making the Stevedore Position Salaried Was an Attempt to Remove Her and Replace Her with a Man*

Before April 2015 and prior to the CBA negotiations, the Plaintiff heard "rumors" circulated by Local 1969 Dockworkers about her stevedore job. Ex. A 175:3–180:21; Ex. A, Dep. Ex. 15, ECF No. 29-1, p. 241. She testified that, in early 2016, "Derek Beach told me my job should be salaried. He told me that H.B. [Kincaid] told him my job should be salaried and he wanted to force me into that salaried position." Ex. A 38:7–10, 107:11–20. The Plaintiff testified that she believed she was being pressured to become a salaried employee so that the Defendant could fire her, and she testified that the pressure in January 2016 was coming from Beach. *Id.* 107:2–4, 8–10. She also testified, "They do not want me in that position as a female, and I have been told they want a male in that position, so that's why [the EEOC charge is] filed as sex." *Id.* 107:4–7. However, in 2015, the Plaintiff did not talk with any company manager or supervisor about her stevedore job potentially being salaried; Dwayne Russell White, President of ILA Local 2038, is the only person the Plaintiff talked to about the issue. *Id.* 48:2–10.

Specifically, the Plaintiff testified that, in 2016, Beach "said he would put his man - - a salaried man in that position" and "turned around and pointed at Steve Trapp." *Id.* 41:12–24. She also testified that Beach said she "shouldn't be a stevedore," the stevedore "should be a man," and that he "will send Steve Trapp to do the job." Ex. SM-12 181:15–21. Beach told her that he did not need her or any union members, that he did not need her to be stevedore, and that when she finished her degree and left, "he would have one of his guys do the job." Ex. A 74:19–75:1.

8

**C.      The February 2016 Employee Warning Notice for Violating the Prescription Drug Reporting Requirement**

*1.      The Relevant CBA Provisions*

The 2015 CBA contains a prescription drug reporting requirement in Section 25.7:

> An Employee must report the use of prescribed medications to Human Resources by the first business day after beginning the use of the medication. This requirement includes medications which could impair an Employee's mental or physical capacities, and/or is of a category outlined in the 10 Panel Drug Test as per Section 27.5. . . .
>
> When an Employee submits proof of their current medications, a copy will be retained in their medical file and the Employee will receive proof that the prescriptions have been submitted. Employees who fail to submit a current copy of their prescriptions as defined in paragraph one, to Human Resources, will be subject to a three (3) day suspension for the first occurrence and a one (1) year suspension as per the Drug and Alcohol Policy of this Agreement for the second occurrence.

Ex. A, Dep. Ex. 4, Section 25.7, ECF No. 29-1, pp. 190–91.

The CBA also includes "Section 27.5: Drug and Alcohol Policy & Procedures," which provides for the random drug and alcohol testing of employees. *Id.* Section 27.5 ¶¶ 3(G), 4, 7, ECF No. 29-1, pp. 209–16. The disciplinary provision of the Drug and Alcohol Policy provides:

> When an Employee is tested for drugs and or alcohol, as provided under Section 4 of this policy, if the Employee's test results are non-conclusive and require additional testing, the Employee will be suspended immediately until test results are available. If the test results prove negative, the Employee shall be reinstated with full back pay for any scheduled days.

*Id.* Section 27.5 ¶ 9, ECF No. 29-1, p. 214. The Drug and Alcohol Policy in Section 27.5 incorporates the prescription drug reporting requirement of Section 25.7. *See id.* Section 27.5 ¶ 5, ECF No. 29-1, pp. 62–63.

The Plaintiff reported her prescription drugs pursuant to the CBA requirement as late as September 27, 2016. Ex. SM-21, ECF No. 37-3. In her June 2017 EEOC charge based on disability, the Plaintiff challenged the prescription reporting requirement. Ex. A, Dep. Ex. 8. On

July 18, 2018, the EEOC issued a Determination, finding, in part, that the requirement was an impermissible medical inquiry in violation of the ADA. Ex. SJ-8, ECF No. 19-1. The Defendant discontinued the prescription drug reporting requirement on August 20, 2018. Ex. SJ-10, ECF No. 19-1.

2. *The Plaintiff's February 2016 Random Drug Test and Subsequent Discipline Under the Prescription Drug Reporting Requirement*

In February 2016, the Plaintiff was randomly selected for a drug screen pursuant to the CBA's Drug and Alcohol Policy, and the initial test results came back "non-negative." Ex. A 10:21–11:24. As a result, the Plaintiff was temporarily suspended from work while the test sample was sent for further analysis; when the final results were negative, she was reinstated to work. *See id.* 11:25–12:8; Ex. C ¶¶ 11, 13, 14; Ex. E 27:16–29:16.

During this time, Gazarkiewicz was notified of the non-negative preliminary test and also that the Plaintiff had not disclosed prescribed medication as required. Ex. C ¶¶ 11, 12. On February 12, 2016, an Employee Warning Notice was issued with an incident date of February 9, 2016, for a violation of the prescription drug reporting requirement. Ex. SJ-4, ECF No. 19-1. The Notice suspended the Plaintiff for three days as "time served" for February 9–11, 2016, and indicated that the consequence for a subsequent violation would be a one-year suspension. *Id.*

When the final drug test came back as negative, the Plaintiff was returned to work and she was "made whole with the exception of a three day suspension for failure to report her medications under the CBA requirements." Ex. C ¶ 14. On February 22, 2016, Gazarkiewicz wrote to the Director of Human Resources, directing that, because the Plaintiff did not have a positive test, the suspension for the prescription drug reporting violation should be revoked and she should be paid for the suspended days. Ex. SJ-5, ECF No. 19-1; Ex. C ¶ 14. He then sent another email indicating that the Plaintiff's suspension was "removed." Ex. SJ-4, p. 2, ECF No.

19-1; *see also* Ex. D 66:22–67:4. The Plaintiff testified that, until the suspension was revoked, it was "very stressful because I didn't know what would happen. When I was written up, it said they would suspend me for 12 months had there been another issue. That's basically firing me. It was very stressful." Ex. A 127:12–20.

### D.     Discrimination and Harassment

The Plaintiff's Title VII claims of discrimination, hostile work environment, and retaliation are based on the following events.

*1.     December 2015 Employee Warning Notice for Hiring a Certain Local 1969 Dockworker*

Sometime in 2015, the Plaintiff hired a certain Local 1969 Dockworker to provide services to the Defendant. Ex. F 22:5–12. On December 28, 2015, Beach issued the Plaintiff an oral warning, memorialized in an Employee Warning Notice, for hiring the Dockworker "after having received a directive not to do so on 9/12/14." Ex. F 21:9–23; Ex. A, Dep. Ex. 29, ECF No. 29-1. With ILA Local 2038 President White's intervention, the discipline was revoked, and the Notice was removed from the Plaintiff's file on January 7, 2016. Ex. D 16:17–17:10; Ex. E 10:21–24; Ex. F 25:2–22, 27:24–25; Ex. F, Dep. Ex. 2 p. 2, ECF No. 29-6. When asked how this discipline was related to her sex, the Plaintiff explained: "[W]hen they told me they wanted to make my position salary, and if I didn't, I would go to utility. I mentioned to them, [Gazarkiewizc], [Beach,] and the union, that they would just fire me if I went salary. None of them disputed that." Ex. A 122:4–15.

*2.     Harassment by Supervisors*

a.     Beach

The Plaintiff testified that, beginning in early 2016, Beach began to treat her differently than supervisors he managed and that he did so because she refused to agree to a salaried

position. Ex. A 40:18–41:25. During that time period, Beach placed the Plaintiff in Utility in a labor position throwing wood blocks in the mill for several weeks. *Id.* 35:1–9. When she attempted to use her seniority to "bump" someone else to take a more preferable job, Beach did not allow it. Ex. SM-12 87:2–25. The Plaintiff was paid her hourly stevedore rate during the temporary assignment in Utility. *Id.* 35:21–24.

In late 2015 or early 2016, Beach, talking with a couple of guys about the Plaintiff drinking, said, in the Plaintiff's presence, that he believed she gets wild when she drinks. Ex. SM-12 61:6–63:20; Ex. A 65:4–10. In May 2016, Beach reached over the Plaintiff's head and made a comment about dusting off her "halo." Ex. A 65:15–23, 220:13–20. In 2016, Beach commented that the Plaintiff cannot climb onto the rail cars because she is skinny. *Id.* 76:11–18. In May 2016, Beach made a comment to the Plaintiff, who had her hood up that, "It's not that cold;" to which the Plaintiff replied, "It is to me;" to which Beach responded, "That's because you are skinny." *Id.* 226:21–23. The Plaintiff testified that Beach makes comments about her glasses on almost a daily basis and that Beach has asked other supervisors to look at the Plaintiff and then called her "Roy Orbison," joking about the Plaintiff's glasses. *Id.* 69:18–70:22. Beach also called her "Miss Hollywood" in reference to her glasses. *Id.* 70:23–72:5. Beach commented that she has low standards because she bought macaroni and cheese from Wal-Mart. *Id.* 66:23–67:13. She testified that she is the only person to whom he makes derogatory comments like that. *Id.* 67:19–23, 68:3–20. Specifically, the Plaintiff testified, "Every comment he makes is negative. He will come into the office and if I don't talk, he says something about it. If I do talk, he says something about it. If I'm wearing something different, he says something about it. He insults what I wear." Ex. SM-12 148:17–23.

In 2016, the Plaintiff was asked to perform two duties that were not part of her job description—providing the scrap yard manager with the details for barge demurrage and, at the request of Beach, creating a spreadsheet of steel commodities coming in and out. *Id.* 22:6–23:23. The Plaintiff did not create the spreadsheet but was not disciplined, although she was "somewhat belittled" by Beach for not helping. *Id.* 23:19–24:1.

Prior to 2015, the Plaintiff asked Beach to get her assistance with her stevedore duties and he did not, even though he found assistance for the planning department when it was requested. Ex. A 72:2–24. In 2016, Beach asked Glenn Whitmore, a forklift driver, to train with Plaintiff so that Whitmore could assist the Plaintiff. Ex. G 9:20–10:25 (Whitmore Dep.), ECF No. 29-7; Ex. E 52:13. Whitmore was trained in stevedore duties and has covered the Plaintiff's vacations, which is about four weeks out of the year. Ex. E 52:5–53:7; Ex. G 9:20–10:25, 11:14–18, 20:1–7, 31:1–6. Approximately 95% of the time when the Plaintiff asks to have Whitmore assist her, Beach says no because Whitmore is needed in shipping. Ex. SM-16 26:15–25, ECF No. 37-2; Ex. G 27:1–9. The Plaintiff identifies it as harassment that Beach did not let Whitmore help her; the Plaintiff explained that there are twelve people in shipping and only one in stevedoring. Ex. A 75:18–76:10, 166:20–24; Ex. SM-12 168:17–22.[4]

No one from the company spoke to the Plaintiff about her EEOC charges, the Plaintiff does not know if Beach knew she had filed EEOC charges, and Beach never mentioned the charges. Ex. A 131:1–24. However, she testified that "his actions substantially changed. All their actions did as soon as the charges went through." *Id.* 131:12–14.

---

[4] The Plaintiff cites page 167 of her deposition transcript, but neither party submitted that page.

b.      Gazarkiewicz

The Plaintiff identified Gazarkiewicz as having harassed her based on gender in the work environment. Ex. SM-12 33:4–17. The Plaintiff identified as discriminatory or harassing Gazarkiewicz's comments: "Don't you like to be busy?" and "We believe that you were treated special and we are going to change that." Ex. A 146:3–147:1.[5] She also testified that Gazarkiewicz did not treat her with respect when she spoke to him after a meeting about Beach harassing her but the issue was never resolved. Ex. SM-12 140:5–141:4. She asked him, "How do I work under a man that I don't trust and give him the daily workload, give him information as to what's going on and share the labor with him? How do I do that with a man that's disrespectful, with a man that treats me the way he treats me?" *Id.* 140:21–141:1. Gazarkiewicz responded, "You're just going to have to figure out a way because [Beach] is not going anywhere." *Id.* 141:2–4. As another example, Plaintiff told Gazarkiewicz that Beach had taken her work product, and Gazarkiewicz responded, "People just do that when they steal each other's work." *Id.* 141:13–142:2; Ex. A 143:1–7. When asked what these incidents have to do with her Title VII claim, the Plaintiff responded, "[A]ll these comments and harassment and bullying all lead up to, Maybe we can frustrate her enough that she'll quit." Ex. A 143:1–8.

c.      Kincaid

The Plaintiff testified that H.B. Kincaid, Vice President of Operations, does not talk to her or acknowledge her. *Id.* 132:21–24. She explained, "He goes through [Beach] and then [Beach] blames him for things, and I kind of wish he would just directly talk to me." *Id.* 132:25–133:2. Kincaid has never said anything to her that she considered offensive; he is "just rude" by rarely talking to her, or, when he does talk to her, saying only "one or two words and he doesn't

---

[5] The Plaintiff cites page 138 of her deposition transcript, but neither party has submitted that page.

ever seem like he's in a good mood." *Id.* 136:5–16. The Plaintiff does not know how Kincaid treats other employees. *Id.* 136:17–18.

3.    *Denial of Training Opportunities*

The Plaintiff would like, but was not given, "backup" training in the event the stevedore position is no longer available to her. *Id.* 91:10–92:1, 103:1. She testified, "If I ask for advancements of discussions on training, I'm told they will think about it and get back to me and they never get back to me." Ex. SM-12 34:1–12. The Plaintiff discusses four such types of training she sought.

First, prior to April 10, 2015, the Plaintiff believed that there was resistance to her receiving forklift certification. *Id.* 189:3–7; Ex. A 192:6–18. However, she obtained the forklift certification. Ex. SM-12 189:8–13.

Second, at some point before April 2015, the Plaintiff requested training in slab planning. Ex. A 195:1–22. She made the request of Beach, who relayed her request to the manager of that department, but, to Beach's knowledge, the Plaintiff never received the training. Ex. SM-15 48:5–7, 51:21–52:22 (Beach Dep.), ECF No. 37-2. The Plaintiff also requested, but did not receive, slab planning training in 2017 and 2018. Ex. A 95:14–96:12. Beach testified that he was not aware of anything in the CBA that would have prevented her from getting the training. Ex. SM-15 52:23–53:12.

Third, in 2016 or 2017, the Plaintiff asked Beach if she could take a metallurgic class that she saw offered in an email, but the class was not being offered at that time. Ex. A 96:16–25.

Fourth, the Plaintiff asked to train in "quality" in either 2016 or 2017, Beach referred the request to the manager of that department, but the Plaintiff did not receive the training. *Id.* 96:13–15, 103:12–15; Ex. SM-15 50:8–51:13.

The Plaintiff could not identify another employee in a similar position who has been treated better than her in terms of training. Ex. A 120:25–121:10. She testified generally that positions were created for "guys" in order to promote or advance them, and she would like training in stevedoring and other areas so that she can have the same opportunities. Ex. SM-12 205:3–25, 207:1–25; Ex. A 206:1–25. She identified Clint Thomas, Edgar Batista, Matthew Philips, and Bill Brooks as hourly employees with less seniority but who received training; however, she does not know what training they received or the details of the positions they hold. Ex. A 114:10–25, 115:18–25, 118:14–24, 119:2–10, 120:8–9, 206:3–6. She testified that Thomas "was given an opportunity to train and advance" to "[s]ome type of supervisory position," but she did not know what training, *id.* 115:18–116:9; Batista received a "created" "[s]upervisory position of some sort" that "might have been better," *id.* 118:25–119:15; and Phillips advanced to shipping supervisor, *id.* 118:14–20. Phillips was hired as a union employee, became a temporary supervisor for six months, and then became the shipping supervisor, a salaried position. Ex. F 9:19–23, 10:18–22, 11:3–8. Bill Brooks has held the specialty position of slab yard planner since before 2010. Ex. H ¶ 6.

4.    *Denial of Supplies in Her Stevedore Position*

The Defendant bought pickup trucks for male workers but purchased a Caliber for the Plaintiff; she testified the car was too small and not as functional as a pickup truck for her job that requires heavy articles, tools, and equipment. Ex. A 76:24–25; Ex. SM-12 77:3–25. She also testified that she was treated differently than male employees by not being provided with tools or equipment for her job: "If I ask for tools or equipment for my job, if it's something that can't be noticed, it gets blocked." Ex. SM-12 34:1–9.

### E.    The Three EEOC Charges

On June 20, 2016, the Plaintiff filed an EEOC charge alleging discrimination based on "sex" that began on January 31, 2016, as a continuing action. Ex. A, Dep. Ex. 7. On June 26, 2017, the Plaintiff filed a second EEOC charge, alleging discrimination based on "disability" beginning December 1, 2015, as a continuing action. Ex. A, Dep. Ex. 8. On June 26, 2017, the Plaintiff also filed her third charge, alleging discrimination based on sex and retaliation beginning on July 2, 2016, as a continuing action. Ex. A, Dep. Ex. 9.

### ANALYSIS

The Plaintiff identifies the following discriminatory and/or retaliatory actions taken against her by the Defendant as the basis of her ADA and Title VII claims in this lawsuit: (1) disciplining and suspending her for not complying with the prescription drug reporting policy; (2) blocking her efforts to obtain training that would facilitate advancement; (3) pressuring her to become a "salaried" (non-union) stevedore to deprive her of union protection; (4) retaliating against her after she resisted the efforts to make her position salaried, including denying her training opportunities, issuing harassing/unjustified "write-ups," and assigning her to work in Utility as a laborer; (5) subjecting her to retaliatory harassment by her supervisor, Beach, after she requested an employee to assist her with an unreasonable workload; and (6) subjecting her to a "hostile work environment." Pl.'s Mem. in Opp. 1.

The Plaintiff seeks summary judgment in her favor on the ADA discrimination claim. In its cross-motion, the Defendant seeks summary judgment on all claims, asserting that some are barred by the statute of limitations and that the Plaintiff has not met her burden of offering evidence to establish certain elements of her claims. The Court first considers the Plaintiff's

ADA claims and then turns to her Title VII claims of discrimination, hostile work environment, and retaliation.

## A.    ADA Claims

The Plaintiff asserts ADA claims of disability discrimination and retaliation. Compl. ¶¶ 3, 10 (citing 42 U.S.C. §§ 12101, 12203), ECF No. 1. She alleges that the Defendant made "a disability-related inquiry by requiring her to submit a list of prescription drugs she was taking, and then disciplining (3-day suspension) her because she had not submitted a current listing of such drugs." *Id.* ¶ 8(c); *see also* Ex. A 10:21–11:14.

The Plaintiff brings her discrimination claim solely under 42 U.S.C. § 12112(d), which provides that "[t]he prohibition against discrimination as referred to in subsection (a) shall include medical examinations and inquiries." *Id.* § 12112(d)(1). As relevant here, "[a] covered entity . . . shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." *Id.* § 12112(d)(4)(A). The Plaintiff does not have a disability, but "[t]his provision applies to all employees, with or without an actual or perceived disability." *Kurtzhals v. County of Dunn*, 969 F.3d 725, 730 (7th Cir. 2020).

In her motion for summary judgment, the Plaintiff requests a court order finding that the Defendant violated § 12112(d)(4)(A) by (a) requiring ILA Local 2038 employees to report the use of prescribed medications without a showing that the requirement was job-related and consistent with business necessity and (b) disciplining the Plaintiff for allegedly failing to do so in February 2016. The Court grants summary judgment in favor of the Defendant because, as it argues, the Plaintiff has not shown a tangible injury-in-fact within the statutory period.

1.    *Tangible Injury*

Standing is a jurisdictional requirement; without standing, a plaintiff's claim cannot proceed. *See Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 332 (7th Cir. 2019). The elements of standing are "an injury in fact that is traceable to the defendant's conduct and redressable by a favorable judicial decision." *Id.* at 333 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "An 'injury in fact' is 'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" *Id*. (quoting *Lujan*, 504 U.S. at 560). A non-disabled plaintiff bringing a claim under § 12112(d) must "at least show some tangible injury-in-fact caused by the § 12112(d) violation." *O'Neal v. City of New Albany*, 293 F.3d 998, 1007 (7th Cir. 2002) (citing *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 519–20 (3d Cir. 2001)); *accord Strong v. Paulson*, 249 F. App'x 470, 473 (7th Cir. 2007).

To establish injury, the Plaintiff cites only her February 12, 2016 discipline, which includes the Employee Warning Notice imposing the three-day suspension, the threat of a possible one-year suspension for a subsequent violation, and the fact that the suspension was not removed until ten days later. Ex. A 127:12–20; *see* Pl.'s SJ Reply 5–6, ECF No. 33. However, the Plaintiff has not shown a tangible injury-in-fact as to the discipline. The suspension was imposed retroactively on February 12, 2016, as "time-served" for the dates February 9–11, 2016, when the Plaintiff had already served the suspension to allow for additional test results as part of the random drug testing. By February 22, 2016, the Employee Warning Notice was revoked, the three-day suspension was vacated, the time was added back to the payroll system, and the

19

Plaintiff was paid for that time. There is no injury for the Court to redress. *See Casillas*, 926 F.3d at 332.

The Plaintiff's stress during the ten-day period before the discipline was revoked is also insufficient to establish a tangible injury-in-fact to survive summary judgment in this case. "When the only evidence of emotional distress comes from the injured party's testimony, '[s]he must reasonably and sufficiently explain the circumstances of [her] injury and not resort to mere conclusory statements.'" *EEOC v. Flambeau, Inc.*, 846 F.3d 941, 946 (7th Cir. 2017) (quoting *Biggs v. Village of Dupo*, 892 F.2d 1298, 1304 (7th Cir. 1990)). Here, the only evidence of the Plaintiff's emotional distress is her deposition testimony that, until the suspension was revoked, it was "very stressful because I didn't know what would happen. When I was written up, it said they would suspend me for 12 months had there been another issue. That's basically firing me. It was very stressful." Ex. A 127:12–20. This conclusory testimony is insufficient to demonstrate a tangible injury-in-fact. *Cf. Flambeau*, 846 F.3d at 946 (finding that the employee's testimony that "they took my insurance away, and my kids didn't know what's going on, and I couldn't go to the doctor and stuff like that" did "not even reach the level of conclusory statements of emotional distress and is insufficient to show he could be entitled to such damages"); *Biggs*, 892 F.3d at 1304–05 (finding the employee's trial testimony "that he was affected emotionally by being fired" and "that he was concerned over 'the idea of my family going through it'" conclusory and insufficient to support the instruction on damages for emotional distress).

Because the Plaintiff has not established a necessary element of standing, the Court grants summary judgment in favor of the Defendant on the Plaintiff's ADA discrimination claim brought under § 12112(d). As a result, the Court does not reach the Plaintiff's argument that the

Defendant cannot show that the prescription reporting requirement was job-related and consistent with business necessity.

2.    *Statute of Limitations*

Even if the Plaintiff's revoked Employee Warning Notice and associated three-day suspension qualify as a tangible injury-in-fact, the claim would be time barred. An ADA charge must be filed with the EEOC within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *see also Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir. 1994) (recognizing that Indiana is a deferral state); 42 U.S.C. § 12117(a) (incorporating Title VII's enforcement provisions under the ADA). An unlawful employment practice occurs on the date of each discrete act that leads to the filing of the EEOC charge, "even if they form part of an ongoing practice or are connected with other acts." *Beamon v. Marshall & Illsley Tr. Co.*, 411 F.3d 854, 860 (7th Cir. 2005) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109–11 (2002)). "Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113. The 300-day "period begins to run when the employee knows [she] has been injured, 'not when [she] determines that the injury was unlawful.'" *Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 240 (7th Cir. 2004) (quoting *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001)). Absent waiver, tolling, or estoppel, untimely claims are barred. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113.

"The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period. For purposes of the limitations period, courts treat such a combination as one continuous act that ends within the limitations period." *R.R. Donnelley & Sons Co.*, 42 F.3d at 445 (quoting *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992)). Nevertheless, "discrete discriminatory acts are not actionable if time barred, even when

they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113; *see Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 708 (7th Cir. 2002). Suspensions are discrete discriminatory acts. *See, e.g.*, *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014) ("Reassignment of duties and suspensions are discrete acts.").

Here, the Plaintiff filed her ADA discrimination charge with the EEOC on June 26, 2017, which means the 300-day lookback period ended August 30, 2016. The Plaintiff received the Employee Warning Notice and three-day suspension for not complying with the policy on February 12, 2016. *See* Ex. A 10:15–11:3; Ex. A, Dep. Ex. 8; Compl. ¶ 8(c). Thus, even if the revoked discipline on February 12, 2016 qualifies as an injury-in-fact, it is a discrete act that is time barred.[6]

### 3.    ADA Retaliation

To prove an ADA retaliation claim, a plaintiff must present evidence of a statutorily protected activity, an adverse employment action, and a causal link between the two. *Koty v. DuPage County*, 900 F.3d 515, 519 (7th Cir. 2018) (citation omitted). Under the ADA, "statutorily protected activity can range from filing formal charges to voicing informal complaints to superiors." *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (internal quotation marks, citations, and emphasis omitted). However, the Plaintiff has not offered any facts demonstrating an adverse action taken in retaliation for filing her June 2017 ADA charge and has not identified any other statutorily protected activity under the ADA.

---

[6] Although the continuing violation doctrine applies to claims of hostile work environment, *see Nat'l R.R. Passenger Corp.*, 536 U.S. at 116–18, and "a plaintiff may assert a claim for an illegal hostile work environment on the basis of disability under 42 U.S.C. § 12112(a)," *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 852 (7th Cir. 2019), the Plaintiff has not alleged or offered evidence of a hostile work environment based on disability in this case.

Accordingly, the Court grants summary judgment in favor of the Defendant on the Plaintiff's ADA retaliation claim.

**B.** **Title VII**

Title VII forbids employment discrimination against any individual with respect to her "compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). On summary judgment, the evidence should be evaluated "as a whole to determine if it 'would permit a reasonable fact finder to conclude that the plaintiff's . . . sex . . . caused the discharge or other adverse employment action.'" *Lewis v. Wilkie*, 909 F.3d 858, 866–67 (7th Cir. 2018) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–65 (7th Cir. 2016)). "Evidence is evidence. Relevant evidence must be considered, and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Ortiz*, 834 F.3d at 765. Although the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), remains a method plaintiffs may use to survive summary judgment, *see Lewis*, 909 F.3d at 867 (citing *Ortiz*, 834 F.3d at 766; *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017)), the Plaintiff does not rely on that framework here. Therefore, the Court considers the evidence as a whole as to the Plaintiff's Title VII claims of sex discrimination, hostile work environment, and retaliation. *See Ortiz*, 834 F.3d at 765.

*1.    Sex Discrimination Claim, Including Hostile Work Environment*

"To survive summary judgment on a Title VII discrimination claim, a plaintiff must present evidence that would permit a reasonable factfinder to conclude that the plaintiff's . . . sex . . . caused [the adverse employment action]." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765). To meet this standard, a plaintiff must

"demonstrate a materially adverse employment action that resulted from the alleged discrimination." *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007) (citing *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)).

"[A] materially adverse employment action is one which visits upon a plaintiff 'a significant change in employment status.'" *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (quoting *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 235 (7th Cir. 2014)). This includes "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Lewis*, 496 F.3d at 653 (quoting *Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000)). A materially adverse employment action generally falls into one of three categories: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011) (citing *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744–45 (7th Cir. 2002)). "Not everything that makes an employee unhappy is an actionable adverse action." *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 470 (7th Cir. 2018).

    a.    Statute of Limitations Applied to the Plaintiff's Sex Discrimination Claims

The Court first addresses the Defendant's argument that the Plaintiff's claims are time barred. As with the ADA claim, a Title VII charge must be filed within 300 days of the discriminatory act. *See* 42 U.S.C. § 2000e-5(e); *Adams v. City of Indianapolis*, 742 F.3d 720, 729, 729 n.7 (7th Cir. 2014). The Plaintiff alleged sex discrimination in her first EEOC charge filed on June 20, 2016; therefore, any discrete act of discrimination that occurred prior to August

24

25, 2015, is barred as a basis for a sex discrimination claim. *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 113. However, for a hostile work environment claim, "if the alleged conduct forms a single unlawful employment practice falling at least in part within the statutory period, the court may consider conduct outside the statute of limitations as part of the . . . claim." *Milligan-Grimstad*, 877 F.3d at 712 (citing *Nat'l R.R. Passenger Corp.*, 536 U.S. at 117–19). The Plaintiff appears to rely on pre-August 25, 2015 events only to bolster her hostile work environment claim. The Plaintiff identifies several events contributing to the allegedly hostile work environment that occurred within the 300-day period, including the Employee Warning Notices in December 2015 and January 2016, the denial of training in 2016, and the comments by Beach in 2016 regarding her drinking and getting wild, her "halo," and her glasses. Thus, the Court may consider events prior to August 25, 2015, that form the single hostile work environment.

> b.      The Plaintiff's Sex Discrimination Claim

In her response brief, the Plaintiff identifies two discriminatory actions taken by the Defendant based on her sex: (1) efforts to convert the stevedore position to salaried, which would deprive her of union protection, and (2) denying her training that would support her stevedore work, provide options during layoffs, and facilitate advancement.

> 1)      CBA Discussion Regarding the Stevedore Position Becoming Salaried

Prior to the ratification of the new CBA on September 28, 2015, the initial negotiations between the Defendant and ILA Local 2038 included a discussion, initiated by the Defendant's Vice President Kincaid, regarding the status of the hourly stevedore position and, in part, whether it should be made a salaried position. The Plaintiff asserts that the Defendant was trying to convert the stevedore position from a protected union position to a salaried position in order to

fire her. This claim does not survive because there is no adverse employment action and no evidence that the discussion was motivated by her sex.

First, the discussion itself is not an adverse action, and the Plaintiff suffered no materially adverse action as a result of the conversation. The idea raised during negotiations was not adopted, and the stevedore position remains an hourly, union position under the 2015 CBA. The Plaintiff continues to hold the stevedore position subject to the terms of the CBA, continues to be in the top seniority position, and continues to receive a higher salary than set out in the CBA for the stevedore position based on the letter of agreement.

The only adverse consequence asserted by the Plaintiff is that she was "fearful that removing the protections of the CBA would make her vulnerable and she would be fired." Pl.'s Mem. in Opp. 20. However, "[a]n unfulfilled threat, which results in no material harm, is not materially adverse." *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 531 (7th Cir. 2003) (citations omitted) (finding no adverse employment action on a disparate impact claim where the employee was informed of impending demotion but was never actually demoted).[7] Here, the Defendant did not threaten termination; the Plaintiff only feared it. The Plaintiff testified that she did not talk to any company manager or supervisor in 2015 about the stevedore job becoming salaried. Inferences supported only by speculation or conjecture will not suffice. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721–22 (7th Cir. 2018). Thus, the Plaintiff's fear of possible future harm is not sufficient to constitute an adverse employment action.

---

[7] Likewise, under the more generous standard for a materially adverse action on a retaliation claim, an "unfilled threat of discipline" or a "threat of future discipline" that "result[] in no injury or harm greater than stress and worry" does not constitute an adverse employment action. *Lewis*, 909 F.3d at 870 (collecting cases); *see also Poullard v. McDonald*, 829 F.3d 844, 856–57, 857 n.3 (7th Cir. 2016) (finding, on a retaliation claim, that threats of unspecified disciplinary action did not constitute adverse actions where there was no effect on the employee's compensation or career prospects).

Second, there is no evidence that Kincaid's discussion with the union was motivated by the Plaintiff's sex or even by a desire to remove the Plaintiff from the stevedore position. In early 2016, Beach told the Plaintiff that Kincaid wanted the stevedore position to be salaried and wanted to force the Plaintiff into that salaried position; there is nothing inherently gender-based or gender-biased about converting an hourly position to a salaried position. Nor has the Plaintiff offered any evidence of gender bias on the part of Kincaid from which a discriminatory intent could be inferred. Although the Plaintiff does not like how Kincaid speaks (or rather does not speak) to her, there is no evidence that Kincaid's conduct was related to her sex. The only evidence the Plaintiff offers to connect her gender to Kincaid's discussion with the union is Beach's comment in early 2016, months after the CBA was ratified, that she "shouldn't be a stevedore," that the stevedore "should be a man," and that he "will send Steve Trapp to do the job." Ex. SM-12 181:15–21. However, Beach testified that he was not consulted during the CBA negotiations, and no evidence indicates any involvement by Beach in the negotiations. Kincaid and Gazarkiewicz, who were present for the conversation with the union, did not discuss the idea in advance. Beach's comments reflect on his own state of mind but do not raise a triable issue that Kincaid's conversation with the union was motivated by the Plaintiff's gender.

  2)  Denial of Opportunities for Training and Advancement

After learning of the discussion regarding the stevedore position becoming salaried, the Plaintiff sought training that would assist her in performing her stevedore function, provide her with options in the event of a layoff and/or the stevedore position was changed to salaried, and facilitate advancement. She contends that it was sex discrimination when her requests for training and advancement were blocked. This claim also does not survive summary judgment because the Plaintiff has offered no evidence that would permit a reasonable fact finder to

conclude that the Plaintiff did not receive the training or opportunities for advancement because of her gender.

First, the Plaintiff has offered no evidence from which a reasonable trier of fact could conclude that she did not receive training in slab planning or in quality because of her gender. The CBA allows for training outside of one's sequence, and both Beach and White testified that such training would be allowed under the CBA.[8] Beach passed along the Plaintiff's requests to the appropriate manager, but she was not given the training. There is no evidence that any other union employee was treated better or differently in relation to training outside of the employee's sequence when the employee did not have a reasonable expectation of holding (or bidding for) that position or working in that department.[9] In contrast, Whitmore was given training in stevedoring, which was outside of his sequence, but the training was for the specific purpose of assisting the Plaintiff and replacing her when she is on vacation. Also, in the spring of 2015, the Plaintiff sought and *received* forklift training, which is outside of her specialty position of stevedore.

Second, the Plaintiff argues that she has been denied an opportunity for advancement by not being given the title of "temporary supervisor" and a corresponding wage increase that were given to male hourly employees. An adverse employment action can be one that affects an "employee's current wealth such as compensation" as well as an "employee's career prospects thus impacting the employee's future wealth." *Lewis*, 496 F.3d at 653. The Plaintiff speculates

---

[8] In her brief, the Plaintiff states that she "was told erroneously, that the CBA precluded training outside her sequence." Pl.'s Mem. in Opp. 22. However, she cites no evidence in support of the statement.

[9] The Plaintiff identifies Matthew Phillips as advancing out of his hourly sequence under the CBA; he advanced to a salaried shipping supervisor after holding the union position of "temporary supervisor" for six months. But the Plaintiff offers no evidence that she and Phillips were similarly situated in terms of their positions or any other relevant factors.

that the Defendant uses the temporary supervisor position to give extra pay to someone who has already reached the top of their sequence. The standard hourly wage rate for a temporary supervisor is higher than the Plaintiff's current hourly rate as stevedore. The temporary supervisor position has only been given to men since 2016, and some of the men have held the temporary supervisor position for more than the 6-months set out in the CBA.

Yet, the Plaintiff has not offered evidence from which a reasonable trier of fact could conclude that she was not given the pay of a temporary supervisor because of her gender. Importantly, the Plaintiff offers no evidence regarding the circumstances of how the men received their temporary supervisor titles, such as their job and supervisory responsibilities and the needs of their departments. The Plaintiff argues that she works in a supervisory capacity because she coordinates and oversees the Local 1969 Dockworkers in relation to the Defendant's activities at the Port of Indiana. However, she offers no evidence comparing the tasks she performs relative to the dockworkers with the supervisory tasks of the men who received the temporary supervisor title. "A court is not a 'super personnel department that second-guesses employers' business judgments.'" *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 895 (7th Cir. 2016) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002)).

Summary judgment is granted in favor of the Defendant on the Plaintiff's claim of discrimination based on sex.

c.      Hostile Work Environment

Title VII's prohibition against discrimination because of an individual's sex "encompasses the 'creation of a hostile work environment' that is severe or pervasive enough to affect the terms and conditions of employment." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 561 (7th Cir. 2016) (quoting *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014)); *see*

*also Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013). To succeed on a hostile work environment claim based on sex, a plaintiff must demonstrate that (1) the plaintiff was subject to unwelcome harassment; (2) the harassment was based on the plaintiff's sex; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *See Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (citing *Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017)).[10]

In determining whether a work environment is hostile or abusive, courts "consider the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance.'" *Alamo*, 864 F.3d at 550 (7th Cir. 2017) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993)); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). Courts also consider "[t]he specific circumstances of the working environment and the relationship between the harassing party and the harassed." *Alamo*, 864 F.3d at 550 (quoting *Robinson v. Sappington*, 351 F.3d 317, 330 (7th Cir. 2003)). "[A]lthough a workplace need not be 'hellish,' to constitute a hostile work environment, a hostile work environment must be 'so pervaded by discrimination that the terms and conditions of employment [a]re altered." *Id.* (citations omitted). "[C]ourts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Hall v. City of Chicago*, 713 F.3d 325, 331 (7th Cir. 2013) (citation omitted).

---

[10] The Seventh Circuit Court of Appeals in *Johnson* recognized that some of its cases phrase the test differently by looking for evidence that the workplace was both subjectively and objectively offensive, in lieu of either the first or third prongs set out here. 892 F.3d at 900. However, the court "concluded that the inquiry is the same." *Id.*

Even when the evidence is viewed in the light most favorable to the Plaintiff, she has not offered evidence to show that her work environment was so pervaded by sex discrimination that the terms and conditions of her employment were altered. Much of the Plaintiff's evidence fails to meet the second prong: She has offered no support for concluding that many of the events she identifies as part of her hostile work environment claim had any relationship to her sex.[11] For example, the Plaintiff does not offer any evidence tying (i) "the regular passive-aggressive action of Kincaid," including ignoring her and other rudeness, (ii) the discussion of the Stevedore position being salaried, (iii) the assignment of additional stevedore duties such as providing details for barge demurrage, (iv) being temporarily assigned to Utility, (v) a comment by Gazarkiewicz that the Plaintiff likes to be busy, or (vi) receiving the Employee Warning Notices to her gender.[12]

The only evidence the Plaintiff provides that suggests a discriminatory actor was motivated by her sex relates to Beach, who, according to the Plaintiff, said she "shouldn't be a stevedore," the stevedore "should be a man," and that he "will send Steve Trapp to do the job."

---

[11] To the extent the Plaintiff attempts to argue that her work environment became hostile because of her opposition to the stevedore position becoming salaried rather than because of her sex, *see* Pl.'s Mem. in Opp. 1, 11, 13, the Plaintiff has similarly failed to identify protected activity for which the acts were retaliatory. *See Flanagan v. Off. of Chief Judge of Cir. Ct. of Cook Cnty., Ill.*, 893 F.3d 372, 375 (7th Cir. 2018) (listing the elements to prove a retaliatory hostile work environment claim, which includes that "the harassment was in retaliation for protected behavior" (citing *Boss*, 816 F.3d at 920)).

[12] The only evidence the Plaintiff offers to connect Gazarkiewicz's comments to her gender is his response at his deposition, when pressed to speculate as to why there is a "small percentage of females in the bargaining unit," that it is "[p]ossibly the nature of our business, heavy industrial." Ex. SM-13 70:5–8; *see* Pl.'s Mem. in Opp. 18. This deposition statement, in the absence of any other gender-related comments or behavior by Gazarkiewicz, is insufficient to impute gender-bias to his comment. The Plaintiff also argues in her brief that her work environment was hostile or abusive because of "regular changes in her workspace that made it more difficult to do her job." Pl.'s Mem. in Opp. 23. However, she offers no evidence, including deposition testimony, in support that any changes in her workspace made it more difficult to do her job.

Ex. SM-12 181:15–21. A reasonable juror could find that those statements suggest that the Plaintiff's gender played a role in Beach's conduct.

In addition to the single comment about replacing the Plaintiff with a man, Beach is the Plaintiff's direct supervisor, and he routinely made negative comments to her in their daily interactions. In late 2015 or early 2016, he commented to a group of men, and in the Plaintiff's presence, that he thinks the Plaintiff must get wild when she drinks. While reaching over the Plaintiff's head to make a brushing gesture, Beach said that he was "dusting her halo." Beach made comments to her and in front of others about her glasses by calling her "Hollywood" and "Roy Orbison," made comments about her being "skinny" and her being unable to climb onto railcars because she is "skinny," and made derogatory comments about where she purchases her lunch. However, even crediting that the Plaintiff's sex was the cause of all such comments by Beach, the Plaintiff has still not sufficiently offered evidence to show that "the terms and conditions of her employment were altered" by Beach's juvenile behavior. Title VII is not a "general civility code." *Faragher*, 524 U.S. at 788. To qualify as a hostile work environment, the discrimination must be "severe or pervasive so as to affect the terms and conditions of employment." *Johnson*, 892 F.3d at 901 (citing *Harris*, 510 U.S. at 21–22). "[E]mployers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018) (citations omitted).

The Plaintiff did ascribe three categories of action to Beach that would affect the terms and conditions of her employment: (i) getting a car instead of a pickup truck, (ii) not receiving requested training, and (iii) not receiving assistance from Whitmore. However, the Plaintiff did not establish that Beach had anything to do with the assigning of vehicles or the denial of

additional training. As for not assigning Whitmore, which the Plaintiff alleges was in retaliation for filing her June 2016 EEOC charge, she has not offered any evidence to establish that failing to assign him to assist her in her duties was enough to change the conditions of her employment such that Beach created a hostile work environment.

The Court grants summary judgment in favor of the Defendant on the Plaintiff's hostile work environment claim.

2.      *Title VII Retaliation*

Under Title VII, an employer is prohibited "from retaliating against an employee for opposing or participating in an investigation of an unlawful employment practice. *Lewis*, 909 F.3d at 866 (citing 42 U.S.C. § 2000e-3(a); *Lord*, 839 F.3d at 563). To survive summary judgment on a retaliation claim, a plaintiff must offer evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007)).

"Statutorily-protected activity 'requires more than simply a complaint about some situation at work, no matter how valid the complaint might be.'" *Skiba*, 884 F.3d at 718 (quoting *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 901 (7th Cir. 2016)). "[T]he complaint must indicate [that] discrimination occurred because of sex, race, national origin, or some other protected class." *Skiba*, 884 F.3d at 718 (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)); *see also Jaburek v. Foxx*, 813 F.3d 626, 633 (7th Cir. 2016) ("A retaliation claimant must produce evidence that she gave 'a cognizable expression of opposition' to discriminatory practices." (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 634 (7th Cir. 2011))). The filing of a formal EEOC charge is "the most obvious form of statutorily

33

protected activity." *Lewis*, 909 F.3d at 867 (quoting *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012)).

In the context of a Title VII retaliation claim, "a materially adverse action need not be one that affects the terms and conditions of employment, but it must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Lewis*, 909 F.3d at 867 (citations and internal quotation marks omitted). The anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 868 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).

In her response brief, the Plaintiff identifies two statutorily protected activities as the basis for her Title VII retaliation claim—her opposition in 2015 to the union stevedore position becoming salaried and the filing of her EEOC charge in June 2016.

a.      Opposition in 2015 to the Stevedore Position Being Salaried

In her brief, the Plaintiff argues that she suffered retaliation after resisting the proposal to make the stevedore position a non-union, salaried position. Pl.'s Mem. in Opp. 23–24. However, because the Plaintiff has offered no evidence that she communicated her belief that the proposal was discriminatory based on her gender, her resistance to the proposal is not statutorily protected activity. To show Title VII retaliation, "a plaintiff must show that she opposed conduct *prohibited by Title VII*, or at a minimum that she had a 'reasonable belief' that she was challenging such conduct." *Skiba*, 884 F.3d at 718 (citation omitted). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Id*. Although the Plaintiff believed that the discussion about converting the stevedore position to salaried was the

34

first step to removing her and that the Defendant wanted to remove her because of her sex, she has offered no evidence that she communicated that belief to any supervisor or manager. The first indication in the record of her communicating to the Defendant that she believed the discussion about the stevedore position becoming salaried was based on her gender is her June 2016 EEOC charge; however, she alleges that the retaliation started in 2015.

In addition, as argued by the Defendant, this claim appears to be untimely. In her response brief, the Plaintiff identifies the discrete retaliatory acts for her "opposition" as the two Employee Warning Notices that she received in December 2015 and January 2016, the denial of training opportunities in the year prior to June 2016, and assigning her to work in Utility as a laborer in early 2016. Pl.'s Mem. in Opp. 1, 24. The Plaintiff did not file an EEOC charge of retaliation until June 26, 2017, which has a 300-day lookback period that ended on August 30, 2016. Therefore, a retaliation claim based on any or all of these events would be barred. To the extent that the Plaintiff is arguing instead that those actions constituted retaliatory harassment, a hostile work environment stemming from retaliatory harassment "is a separate claim from retaliation," but would fail for the same reason: the Plaintiff's opposition to the stevedore position being salaried was not a protected activity. *See Flanagan v. Off. of Chief Judge of Cir. Ct. of Cook Cnty., Ill.*, 893 F.3d 372, 375 (7th Cir. 2018) (citing *Boss*, 816 F.3d at 920); *Lewis*, 909 F.3d at 868 n.3 (citing *Hobbs*, 573 F.3d at 464).

b.      The June 20, 2016 EEOC Charge

The filing of the June 2016 EEOC charge is protected activity. *See Lewis*, 909 F.3d at 867. However, the Plaintiff has not offered evidence of a materially adverse action taken by the Defendant in retaliation for filing the June 2016 charge, much less a materially adverse action that occurred within the 300-day lookback period that began on August 30, 2016.

In the June 2017 EEOC charge, the Plaintiff alleges that Beach retaliated when he did not assign anyone to assist her with her "unreasonable workload" and when he spoke to her rudely and said demeaning things. In her brief, she argues only generally that filing the June 2016 charge "led to further retaliation." Pl.'s Mem. in Opp. 24. The Plaintiff has offered no evidence of her "unreasonable workload" to show that not receiving assistance was a significant, rather than a trivial, harm. *See Burlington N. and Santa Fe Ry. Co.*, 548 U.S. at 68; *Boss*, 816 F.3d at 918–19 ("An employee must suffer something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" (quoting *Hobbs*, 573 F.3d at 463–64)). Nor do Beach's various comments, which may be described as "personal animosity or juvenile behavior," constitute a materially adverse employment action in this context. *See Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 383 (7th Cir. 2020) (quoting *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1107 (7th Cir. 2012)).

Accordingly, the Court grants summary judgment in favor of the Defendant on all aspects of the Plaintiff's Title VII retaliation claim.

## CONCLUSION

For these reasons set forth above, the Court DENIES the Plaintiff's Motion for Partial Summary Judgment [ECF No. 18], GRANTS the Defendant's Motion for Summary Judgment [ECF No. 28], and DENIES as moot the Defendant's Motion to Strike Inadmissible Evidence Tendered in Support of Plaintiff's Brief in Opposition to Summary Judgment [ECF No. 42]. The Court grants summary judgment in favor of the Defendant and against the Plaintiff on all claims.

SO ORDERED on March 22, 2021.

 s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
